## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

THOMAS J. BEAL, *on behalf of himself and all others similarly situated*,

      *Plaintiff*,

      v.

CREDIT PLUS, LLC, *in its individual capacity and as successor in interest to* CREDIT PLUS, INC., and XACTUS, LLC; and DOES 1-10 inclusive,

      *Defendants*.

Civil Matter No. 2:24-cv-01462-AB

**TRIAL BY JURY DEMANDED**

## AMENDED CLASS ACTION COMPLAINT

NOW COMES Plaintiff THOMAS J. BEAL, who respectfully alleges as follows:

### I.    PRELIMINARY STATEMENT

1.    This is a consumer class action brought pursuant to the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x, seeking relief for Defendants' widespread failure to follow reasonable procedures to assure the maximum possible accuracy of information about consumer bankruptcies that it includes on credit reports.

### II.    JURISDICTION *and* VENUE

2.    Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. §1331.

3.     This Court has jurisdiction over the Defendants named herein because each maintains its principal place of business within the boundaries of the Eastern District of Pennsylvania.

4.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

### III.   PARTIES

5.     Plaintiff THOMAS J. BEAL is a natural person who resides in Salinas, California.

6.     At all times pertinent hereto, Plaintiff was a "consumer." *See* 15 U.S.C. § 1681a(c).

7.     Defendant CREDIT PLUS, LLC is a Delaware limited liability company. Its principal place of business is located at 370 Reed Road, #100, Broomall, Pennsylvania. Defendant is the successor to Credit Plus, Inc., a Maryland corporation, which was converted into a Delaware limited liability company on or about September 13, 2021.

8.     Defendant XACTUS, LLC is a Delaware limited liability company. Its principal place of business is located at 370 Reed Road, #100, Broomall, Pennsylvania, 19008. Defendant acquired Credit Plus, LLC in October 2021.

9.     At all times pertinent hereto, Defendants, individually, were a "person," "consumer reporting agency," *see* 15 U.S.C. §§ 1681a(b), (f). Because Xactus, LLC

is the successor to Credit Plus, LLC, the Defendants may also collectively be referred to as "Defendant" (singular) herein.

10.     The true names and capacities, whether individual, corporate, associate, governmental, or otherwise, of Defendants, DOES 1 through 10, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. When the true names and capacities of said Defendants have been ascertained, Plaintiff will amend this Complaint accordingly. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused damages thereby to Plaintiff, as hereinafter alleged.

11.     At all times mentioned herein, each of the Defendants was the agent, servant, employee and/or joint venturer of each of his or her Co-Defendants, and at all said times, each Defendant was acting in the full course and scope of said agency, service, employment and/or joint venture. Any reference hereafter to "Defendants" without further qualification is meant by Plaintiff to refer to each Defendant named above.

12.     Plaintiff is informed and believes, and thereon alleges that at all times mentioned herein, Defendants, DOES 1-10, inclusive, were and are individuals, corporations, partnerships, unincorporated associations, sole proprietorships and/or

other business entities organized and existing under and by virtue of the laws of the State of Pennsylvania, or the laws of some other state or foreign jurisdiction, and that said Defendants, and each of them, have regularly conducted business within the boundaries of this district.

### IV.   **FACTUAL ALLEGATIONS**

*The Applicable Legal Background*

13.    Concerned with abuses in the consumer reporting industry, Congress enacted the FCRA in 1970 "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (citing *Guimond v. Trans Union Credit Info. Co*., 45 F.3d 1329, 1333 (9th Cir. 1995)).

14.    The FCRA principally regulates "consumer reporting agencies" ("CRAs"), companies that prepare "consumer reports" about individuals (or "consumers") for the CRAs' customers (or "users").

15.    The FCRA defines a CRA as:

[A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

16.     Some CRAs, such as the well-known trio of Trans Union, Equifax, and Experian, maintain massive databases of consumer credit information from which they construct credit files about individual consumers. When a user requests a consumer report from one of these CRAs, the CRA prepares the report from information in its own files.

17.     Other "reseller" CRAs do not maintain their own databases of consumer credit information. Rather, when a user requests a consumer report about a given consumer from one of these CRAs, the CRA acquires information about that consumer, usually from other CRAs, for the purpose of preparing the requested consumer report for its user.

18.     Defendants are "reseller" CRAs, which the FCRA defines as "a consumer reporting agency" that:

> (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

15 U.S.C. § 1681a(u).

19.     The FCRA imposes many duties on CRAs like Defendants. Relevant here is the requirement that, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible

accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

20.     FCRA section 1681e(b) applies to all CRAs, irrespective of whether a CRA maintains a database of consumer information or resells information acquired from other CRAs.

21.     That is, reseller CRAs like Defendants have an independent duty to "follow reasonable procedures to assure maximum possible accuracy of the information" they assemble and merge about consumers like Plaintiff.

22.     Federal courts have, almost without exception, rejected reseller CRAs' common contention that they are not subject to FCRA section 1681e(b). *See Starkey v. Experian Info. Solutions, Inc.*, 32 F. Supp. 3d 1105, 1109 (C.D. Cal. 2014) (finding that while "resellers" are a subcategory of "credit reporting agencies" as defined by the FCRA, "nowhere does the FCRA set forth a different standard in § 1681e(b)" which requires consumer reporting agencies to employ reasonable procedures to provide accurate information); *Dirosa v. Equifax Info. Servs. LLC*, No. 13-131, 2014 WL 3809202, at *3 (C.D. Cal. Jan. 21, 2014) ("Plaintiff has raised a genuine dispute as to whether Defendant's reports were inaccurate because they included information that was incorrect on its face."); *see also Ocasio v. Corelogic Credco, LLC*, No. 14-cv-1585-NLH-JS, 2015 WL 5722828, at *3-*4 (D.N.J. 2015) (rejecting

contention that reseller CRAs "need only accurately reproduce information furnished to it by other credit bureaus" and collecting cases).

23.    Notwithstanding the clarity of FCRA section 1681e(b)'s language and the nearly unequivocal judicial interpretations thereof holding all CRAs to the same "maximum possible accuracy" standard, reseller CRAs routinely assemble and merge irreconcilable information into the consumer reports they sell to their customers, especially when that information concerns public records, such as bankruptcy records.

24.    Multiple courts have held that the inclusion of facially contradictory information in a consumer report can be evidence of unreasonable procedures in violation of FCRA section 1681e(b). *See Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 52 (D.C. Cir. 1984) ("[I]nconsistencies within a single file or report . . . can provide sufficient grounds for inferring that an agency acted negligently in failing to verify information."); *Sheffer v. Experian Info. Sol's, Inc.*, No. 02-cv-7407, 2003 WL 21710573, at *2 (E.D. Pa. July 24, 2003) (referencing a consumer report that "indicated both that Plaintiff was born in 1969 and that the account was opened in 1965" as one of two "inconsistencies" that "provide[d] a basis from which a jury could infer that the procedures were unreasonable"); *Evantash v. G.E. Cap. Mortg. Servs., Inc.*, No. 02-CV-1188, 2003 WL 22844198, at *4 (E.D. Pa. Nov. 25, 2003) (CRA's failure to inquire further about the status of consumer's account after

receiving inconsistent information about it from the creditor provided basis from which a jury could find procedures unreasonable); *Smith v. LexisNexis Screening Sols. Inc.*, 138 F. Supp. 3d 872, 882–83 (E.D. Mich. 2015) ("Courts have routinely found that internal discrepancies are sufficient to raise an issue of fact for the jury."), *aff'd in part, rev'd in part*, 837 F.3d 604 (6th Cir. 2016); *Gohman v. Equifax Info. Servs., LLC*, 395 F.Supp.2d 822, 827–828 (D. Minn. 2005) (notation of accountholder's death, which was inconsistent with remainder of consumer's file, could lead jury to infer absence of reasonable procedures); *McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917, 930 (W.D. Wis. 2004) ("Other courts have recognized that receiving inconsistent information may trigger a duty on the part of the [CRA] to investigate."); *Jones v. Credit Bureau of Greater Garden City, Inc.*, No. 87–1302–C, 1989 WL 107747, at *7 (D. Kan. Aug. 28, 1989) (conflict in addresses should have alerted CRA to potential inaccuracies); *Morris v. Credit Bureau of Cincinnati, Inc.*, 563 F. Supp. 962, 968 (S.D. Ohio 1983) (rejecting defendant's argument that it had no way of knowing that two files containing a similar name concerned the same person, because defendant should have had a procedure in place that would have detected the similarities in the files, which should prompt a reasonable investigation); *Rogue v. Corelogic Credco, LLC*, No. 1:19-CV-00260-BLW, 2020 WL 7061745, at *3 (D. Idaho Dec. 2, 2020) ("[H]ere, there was information that by its existence showed that there was a potential inaccuracy, *i.e.,*

there was information regarding a bankruptcy contained on only one [CRA's] report—the Experian report—that was not included on the other two [CRAs'] reports, and this inconsistency indicated that the information from the Experian report was potentially inaccurate.").

25.    Courts have also rejected reseller CRAs' arguments that they are entitled to rely upon presumptively reliable sources, often other CRAs, when the information obtained is inconsistent or irreconcilable with information already in the CRAs' files. *Bryant v. TRW, Inc.*, 487 F. Supp. 1234, 1242 (E.D. Mich. 1980), *aff'd* 689 F.2d 72 (6th Cir. 1982). ("[R]eceiving apparently inconsistent credit reports may trigger an obligation to investigate on the part of the credit reporting agency . . . [because] allowing credit reporting agencies to act as nothing more than mere conduits of information would eviscerate the act's emphasis on reasonable compilation procedures."); *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1239 (10th Cir. 2015) ("Courts have held [CRAs] must look beyond information furnished to them when it is inconsistent with the [CRAs'] own records, contains a facial inaccuracy, or comes from an unreliable source."); *Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 675 (6th Cir. 2022) (CRAs may reasonably rely "on information gathered by outside entities . . . so long as the information is not 'obtained from a source that was known to be unreliable' and is 'not inaccurate on its face' or otherwise 'inconsistent with information the [credit reporting agencies] already had

on file.'"); *see also Smith v. Auto Mashers, Inc.*, 85 F. Supp. 2d 638, 641 (W.D. Va. 2000) (information not presumptively reliable where "inherently implausible or internally inconsistent").

26.     The main federal regulator of CRAs, the Consumer Financial Protection Bureau ("CFPB"), has also provided authoritative guidance on this subject. In its review of reseller CRAs' practice of preparing merged consumer reports that contain information from multiple CRAs, the CFPB found violations of FCRA section 1681e(b) when "the reseller(s) used systems with known programming errors that introduced inaccuracies in consumer report data when the reseller(s) merged consumer report data they had purchased from multiple [CRAs]." CONSUMER FINANCIAL PROTECTION BUREAU, *Supervisory Highlights Consumer Reporting Special Edition*, 8, Issue 14 (March 2, 2017), *available at* http://files. consumerfinance.gov/f/documents/201703_cfpb_Supervisory-Highlights-Consumer-Reporting-Special-Edition.pdf.

27.     More recently, in an advisory opinion, the CFPB stated that:

[CRAs are] uniquely positioned to identify certain obvious inaccuracies and implement policies, procedures, and systems to keep them off of consumer reports. In some cases, such as when certain account or other information fields on consumer reports are logically inconsistent with other fields of information, a consumer reporting agency can detect the logical inconsistencies and prevent the inaccurate information from being included in consumer reports it generates, thereby avoiding the consumer harm to individual consumers that can result from reporting such inaccurate information.

CONSUMER FINANCIAL PROTECTION BUREAU, *Advisory Opinion on Fair Credit Reporting; Facially False Data*, 3, Oct. 20, 2022, *available at* https://files.consumerfinance.gov/f/documents/cfpb_fair-credit-reporting-facially-false-data_advisory-opinion_2022-10.pdf.

28.     Moreover, CRAs have long been on notice that using distilled, incomplete public records information purchased from an unsupervised third-party vendor may be an unreasonable procedure under FCRA section 1681e(b).

29.     This practice was the impetus for regulatory investigations of the "Big Three" CRAs, TransUnion, LLC, Equifax Information Services, LLC, and Experian Information Solutions, Inc., and dozens of FCRA lawsuits throughout the United States, including in this District.

30.     In 2015, the CFPB noted that CRAs did not adequately oversee their public records vendors:

> Examiners found that the oversight of public records providers by one or more CRAs was weak and required corrective action. For example, one or more CRAs had never conducted a formal audit of their public records providers. In addition, one or more CRAs did not have defined processes to verify the accuracy of public record information provided by their public records providers. In light of such weaknesses, Supervision directed one or more CRAs to establish and implement suitable and effective oversight of public records providers.

CONSUMER FINANCIAL PROTECTION BUREAU, *Supervisory Highlights*, 2.1.1 (Summer 2015), *available at* http://files.consumerfinance.gov/f/201506_cfpb_supervisory-highlights.pdf.

31.     Further, the CFPB expressed concern about the accuracy of public

records information that the CRAs imported into their consumer databases:

> Examiners reviewed quality control processes with respect to the
> accuracy of consumer reports produced by one or more CRAs and
> found that, with certain exceptions, there were no quality control
> policies and procedures to test compiled consumer reports for accuracy.
> While processes existed to analyze and improve the quality of incoming
> data, there was no post-compilation report review or sampling to test
> the accuracy of consumer reports. In light of these weaknesses,
> Supervision directed one or more CRAs to develop a plan with
> implementation timelines to establish quality controls that regularly
> assess the accuracy and integrity of the consumer reports and consumer
> file disclosures produced.

*Id*. at 2.1.2.

32.     Other regulators, including the New York Attorney General, initiated

investigations of the Big Three in part due to similar problems with the accuracy and

currency of publics records information in credit reports.

33.     The Big Three ultimately entered into an agreement with the New York

Attorney General that they took to calling the "National Consumer Assistance Plan"

("NCAP"). *Settlement Agreement*, In the Matter of the Investigation by Eric T.

Schneiderman, Attorney General of the State of New York, of Experian Information

Solutions, Inc.; Equifax Information Services, LLC; and TransUnion, LLC,

*available          at*          http://www.ag.ny.gov/pdfs/CRA%20Agreement%20

Fully%20Executed%203.8.15.pdf.

34.     As of July 1, 2017, pursuant to the requirements of the settlement and the NCAP, the Big Three ceased including in credit reports civil judgment information that did not meet certain minimum standards, including the requirement that civil judgment information be refreshed at least every 90 days. In practice, this meant that civil judgments disappeared entirely from consumer reports prepared by the Big Three. CONSUMER FINANCIAL PROTECTION BUREAU, *Quarterly Consumer Credit Trends Report*, 2-3 (February 2018) *available at* https://www.consumerfinance.gov/documents/6270/cfpb_consumer-credit-trends_public-records_022018.pdf.

35.     In the wake of NCAP and widespread private litigation, regulators and courts offered additional guidance to CRAs concerning their public records practices and procedures.

36.     In October 2023, the CFPB and the Federal Trade Commission ("FTC") took a Trans Union subsidiary to task for including information about court filings in its consumer reports but failing to "have reasonable procedures in place to check for any available disposition information and to ensure that such information is included." In particular, the regulators addressed the correct reporting of post-filing bankruptcy dispositions, noting that, "if a bankruptcy has been discharged, it would be misleading and inaccurate to report the bankruptcy filing without also reporting the result."

13

CONSUMER FINANCIAL PROTECTION BUREAU, *CFPB and FTC Take Actions Against TransUnion for Illegal Rental Background Check and Credit Reporting Practices*, Oct. 12, 2023, *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-ftc-take-actions-against-transunion-illegal-rental-background-check-and-credit-reporting-practices/.

37.     In January 2024, the CFPB issued an advisory opinion to CRAs that include matters of public record in reports about consumers. In expressing its interpretation of FCRA section 1681e(b), the CFPB stated that a CRA "that reports public record information is not using reasonable procedures to assure maximum possible accuracy if it does not have reasonable procedures in place to ensure that . . . it includes any existing disposition information if it reports . . . court filings." CONSUMER FINANCIAL PROTECTION BUREAU, *Advisory Opinion Fair Credit Reporting, Background Screening*, 7, January 11, 2024, *available at* https://files.consumerfinance.gov/f/documents/cfpb_fair-credi-reporting-background-screening_2024-01.pdf.

38.     At least one circuit court has also weighed in, finding that "a jury could find that [a reseller CRA] failed to implement reasonable procedures to assure maximum possible accuracy" when it "did not have procedures in place to verify whether the court-records information it received from [its vendor] was either

correct or complete [and] did it independently spot-check or otherwise review the underlying dockets." *McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 97–98 (1st Cir. 2022).

*Plaintiff's Experience*

39.    On July 6, 2016, Plaintiff filed a voluntary petition for bankruptcy pursuant to Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California. Plaintiff's petition was assigned case number 3:16-BK-30750-HLB.

40.    On December 3, 2019, the clerk entered a "Notice of Chapter 13 Case Closed Without Discharge" on the publicly available PACER docket in Plaintiff's bankruptcy case.

41.    In early 2022, Plaintiff sought to obtain a residential mortgage loan.

42.    On or about January 26, 2022, Defendant Credit Plus, LLC, at the direction of and pursuant to the instructions of Defendant Xactus, LLC, prepared a "merged infile credit report" about Plaintiff by obtaining information about him from three other CRAs, namely Experian, Trans Union, and Equifax, and assembling that information into a single, merged document (the "Report").

43.    Defendant prepared the Report for a fee and not gratuitously.

44.    Defendant prepared the Report for Plaintiff's prospective creditor, which Defendant had reason to believe intended to use the Report in connection with a credit transaction involving Plaintiff, namely a residential mortgage loan.

45.     Thus, the Report was a "consumer report," *see* 15 U.S.C. §§ 1681a(d), 1681b(a)(3)(A).

46.     Consistent with its standard practice, Defendant prepared the Report in an automated fashion. Specifically, the Report itself provided that, "This is a report containing information supplied by the repositories listed above [Trans Union, Equifax and Experian]. The merge process is automated and the report may include some duplications and/or omissions."

47.     Indeed, upon review of the Report, it is apparent that Defendant selectively chooses tradelines and other information from one repository in some instances and from another repository in other instances.

48.     Under the heading "Public Records," the Report included information concerning Plaintiff's bankruptcy case (the "Information") that highlighted information from Equifax rather than information from Experian or Trans Union:

| PUBLIC RECORDS | | |
|---|---|---|
| B   B   US BKPT CT CA SAN FRAN | File Date:  07/16 | Plaintiff: |
| Docket #: 1630750 | Amount:  - | Action Type:  CHAPTER 13 BANKRUPTCY |
| Source: XP/TU/EF | Status Date:  12/19 | Status:  DISCHARGED |
| *** -DSP-12/19-VER-12/21 | | |

49.     Immediately beneath this excerpt, the Report states that, "This information is based upon the available identifying information available in the public record and may not be accurate," but this was untrue because Defendant obtained the information from its CRA "sources," not directly from public records.

50.     The Information was inaccurate because Defendant reported Plaintiff's bankruptcy petition with a "DISCHARGED" status when no discharge order had

been entered in Plaintiff's case. Rather, the clerk entered a "Notice of Chapter 13 Case Closed Without Discharge" on the public record, reflected on the PACER docket as of December 3, 2019.

51.    Defendant knew or should have known that the Information was inaccurate because Defendant failed to reconcile information about Plaintiff's bankruptcy case that it had obtained from Equifax, which incorrectly reported that Plaintiff's bankruptcy case had been "discharged," with facially inconsistent information Defendant simultaneously obtained or had available to it from Experian and Trans Union, which reported Plaintiff's bankruptcy case "Bankruptcy Chapter 13-petition-filed" and "Chapter 13 bankruptcy dismissed," respectively. None of the CRA sources from which Defendant obtained information about Plaintiff's bankruptcy had the same information as each other.

52.    Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it reported about Plaintiff by, without limitation, failing to properly review and interpret records from the United States Bankruptcy Court when presented with inconsistent, irreconcilable, contradictory information from other CRAs and by including inaccurate information that directly contradicts the record of the United States Bankruptcy Court.

53.    If Defendant had followed reasonable procedures to assure the maximum possible accuracy of the information it included in the Report about

Plaintiff, it would have reconciled the conflicting records obtained from Experian, Trans Union, and Equifax concerning Plaintiff's bankruptcy case by, without limitation, reviewing the final, publicly available docket entry in Plaintiff's bankruptcy case.

54.    The Information reflected negatively upon Plaintiff, his credit repayment history, his financial responsibility, and his creditworthiness. Although a bankruptcy discharge order is a powerful tool that grants a debtor his fresh start, it comes at a price, including the stigma the discharge creates from the perception that the debtor has successfully used the court process to avoid repaying some, or all, of his debts. *See Perry v. Com. Loan Co*., 383 U.S. 392, 395 (1966) (describing how Congress took these stigmatizing effects into account when drafting bankruptcy laws in 1898); *see also In re Williams*, 305 B.R. 618, 621–22 (Bankr. D. Conn. 2004) (where debtor sought to dismiss case after changed circumstances, citing the "stigma" attached to the completion of the case through discharge); *In re Martin*, 30 B.R. 24, 26 (Bankr. E.D.N.C. 1983) (same); Sara Murray, *Bankruptcy Comes with Social Stigma*, THE WALL STREET JOURNAL, Nov. 25, 2010, *available at* https://www.wsj.com/articles/BL-REB-12588 (last visited Jan. 12, 2024). By contrast, a case closure without discharge does not carry the same stigma. After all, bankruptcy cases could be closed prior to discharge for a variety of reasons, including that a debtor had a change of fortune, perhaps found a new job and did not

need to rely on a bankruptcy, or like Plaintiff, went through and completed his plan but did not complete a financial management educational course.

55.     At all times pertinent hereto, Defendant included, rather than reconciled, facially contradictory information about consumers whenever it prepared consumer reports and/or consumer credit reports.

56.     At all times relevant to the allegations herein, electronic bankruptcy court records, including records concerning the dispositions of such cases, were publicly available through the PACER system for a nominal fee.

57.     At all times pertinent hereto, Defendants acted by and through their agents, servants and/or employees, who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

58.     Upon information and belief, Defendants operate as a unified CRA, sharing, without limitation, technological infrastructure, databases, and computer systems toward the end of preparing consumer reports about consumers like Plaintiff. *See* 15 U.S.C. § 1681x (forbidding evasion of FCRA duties via corporate structure); *see also McIntyre v. Trans Union LLC, et al.*, No. 2:18-cv-3865-RBS, 2020 WL 1150443, at *4 (E.D. Pa. Mar. 5, 2020) (denying motion to dismiss claims against CRA because complaint adequately alleged circumstances amounting to Trans Union's evasion of its FCRA duties through a subsidiary).

59.     At all times pertinent hereto, the conduct of Defendants, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights of the Plaintiff herein.

## V.     CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action on behalf of the following Classes:

### *Conflicting Bankruptcy Information Class*

For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of the Court's class certification order, all natural persons with an address in the United States and its Territories about whom Defendant obtained bankruptcy action type or status information from at least two CRA sources that was inconsistent among the CRA sources, from which Defendant selected one action type and/or status to include in a merged report it published to a third party, which merged report displayed an action type or status inconsistent with records available on PACER.

### *Inaccurate Bankruptcy Status Class*

For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of the Court's class certification order, all natural persons with an address in the United States and its Territories about whom Defendant prepared a consumer report that included a bankruptcy public record with a "DISCHARGED" status when the person's bankruptcy case had, according to records available on PACER, been closed without a discharge.

61.     The members of the Classes are so numerous that joinder of all members is impracticable. Although the precise number of Class members is known only to Defendant, Plaintiff avers upon information and belief that the members of the Classes number in the thousands. Defendant sells consumer reports to thousands

of businesses throughout the country, which reports are standardized, form documents, produced by the same practices and procedures applicable to all subjects of the reports.

62.    There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class members. The principal questions concern whether Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of information it assembled from more than one source and merged in consumers' reports; and whether Defendant's conduct was willful.

63.    Plaintiff's claims are typical of the claims of the members of the Classes, which all arise from the same operative facts and are based on the same legal theories.

64.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is committed to vigorously litigating this matter and has retained counsel experienced in handling consumer class actions. Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue this claim.

65.    This action should be maintained as a class action because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members

which would establish incompatible standards of conduct for the parties opposing the Classes, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

66.    Whether Defendants violated the FCRA can be determined by examination of Defendant's policies and conduct and a ministerial inspection of Defendant's business records and the information it obtained from multiple CRA sources with publicly available bankruptcy court orders.

67.    A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is slight because the maximum statutory damages are limited to between $100.00 and $1,000.00 under the FCRA. Management of the Classes' claims is likely to present significantly fewer difficulties than those presented in many individual claims.

68.    The identities of the members of the Classes may be derived from Defendant's records.

## VI.   <u>CLAIMS *for* RELIEF</u>

### COUNT I
### Violation of 15 U.S.C. § 1681e(b)
### On Behalf of Plaintiff and the Classes

69.   Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

70.   Defendants willfully violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information it obtained and published about Plaintiff and Class members by, without limitation, failing to reconcile facially inconsistent information about bankruptcy case dispositions obtained from more than one source.

71.   As a result of Defendant's conduct and omissions, it published inaccurate, harmful, and derogatory consumer reports about Plaintiff and members of the Class to various third parties, including, without limitation, Plaintiff's and Class members' prospective creditors.

72.   As a result of Defendant's violations of 15 U.S.C. § 1681e(b), it is liable to Plaintiff and members of the FCRA Classes for those remedies set forth in 15 U.S.C. §§ 1681n and 1681o.

## VII.   <u>JURY DEMAND</u>

73.   Plaintiff demands trial by jury on all issues.

## VIII.  <u>PRAYER *for* RELIEF</u>

WHEREFORE, Plaintiff prays this Honorable Court grant him the following relief:

A.      certifying the proposed Classes under Federal Rule of Civil Procedure 23 and appointing Plaintiff and his counsel to represent them;

B.      awarding actual damages pursuant to 15 U.S.C. § 1681o(a);

C.      awarding statutory damages in the amount of not less than $100 and not more than $1,000 per violation to each member of the FCRA Class pursuant to 15 U.S.C. § 1681n(a);

D.      awarding punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

E.      awarding costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o;

F.      and granting such other and further relief as may be just and proper.

Dated:   April 16, 2024                    Respectfully submitted,

                                           THOMAS J. BEAL, *on behalf of himself and all others similarly situated,*

                                By:   */s/John Soumilas*
                                           John Soumilas
                                           Jordan M. Sartell*
                                           **FRANCIS MAILMAN SOUMILAS, P.C.**
                                           1600 Market Street, Suite 2510
                                           Philadelphia, PA 19103
                                           T: (215) 735-8600
                                           F: (215) 940-8000
                                           jsoumilas@consumerlawfirm.com
                                           jsartell@consumerlawfirm.com

                                           Erika Angelos Heath*
                                           **FRANCIS MAILMAN SOUMILAS, P.C.**
                                           369 Pine Street, Suite 410
                                           San Francisco, CA 94104
                                           T: (628) 246-1352
                                           F: (215) 940-8000
                                           eheath@consumerlawfirm.com

                                           Daniel Zemel
                                           **ZEMEL LAW, LLC**
                                           400 Sylvan Ave., Suite 200
                                           Englewood Cliffs, NJ 07632
                                           T: (862) 227-3106
                                           F: (973) 282-8603
                                           dz@zemellawllc.com

                                           *Attorneys for Plaintiff*

                                           **pro hac vice* application forthcoming